[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff Connecticut Office of Consumer Counsel ("OCC") appeals a decision of the defendant Department of Public Utility Control ("DPUC"), which granted, in part, the application of the defendant Connecticut Natural Gas Company ("CNG") for approval of amended rate schedules pursuant to C.G.S. 16-19. The appeal is brought pursuant to C.G.S.16-35 and 4-183 (rev'd to 1989). The OCC requested and was granted party status in DPUC Docket No. 89-02-09, which is the administrative proceeding from which this appeal has been taken. CNG is a "public service company" as defined in section 16-1 of the General Statutes and provides gas service to more than 130,000 customers in the greater Hartford area and the Town of Greenwich. The DPUC is the regulatory agency of the state which is charged by statute with the regulation and supervision of public service companies, including their operations and internal workings, and the establishment of the level and structure of rates. The defendant Prosecutorial Division of the DPUC is a party to CT Page 7742 these proceedings pursuant to section 16-19j of the General Statutes. The remaining defendants are independent public or private organizations that were designated parties or intervenors in the administrative proceedings. Defendants CNG and DPUC are the only defendants to appear, file briefs and present oral arguments at the hearing before this court.
On March 13, 1989, CNG filed with the DPUC an application for approval of amended rate schedules pursuant to section 16-19 of the General Statutes. The application was assigned Docket No. 89-02-09. Public hearings commenced on 9, 1989 and concluded on June 9, 1989, consuming all or part of 23 hearing days. On August 9, 1989, after briefs had been filed and a draft decision rendered, the DPUC continued the hearing, over objections by the OCC, to allow the admission of new evidence and cross-examination pertaining to certain exhibits offered by CNG. The DPUC overruled the OCC's to the August 9, 1989 limited hearing and denied the OCC's request to expand the scope of that hearing. Throughout the regular, scheduled proceedings before the DPUC, however, the OCC submitted pre-filed testimony, responses to interrogatories late filed exhibits, and presented oral testimony.
On August 23, 1989, the DPUC issued a decision in Docket No. 89-02-09. The decision was mailed to the parties on August 24, 1989. On September 1, 1989, the DPUC issued a supplemental decision, approving rates for interruptible gas service filed by the CNG on August 28, 1989. CNG's initial application had sought a 12.2% increase in its rates, or $22,164,754 in additional annual revenues. The DPUC's decision approved an increase of 7.26%, or $13,535,882 in additional annual revenues.
In September 1989, the OCC moved for reconsideration of the DPUC's decision and also filed an appeal to this court, No. CV 89-700457S. On October 5, 1989, the DPUC denied OCC's motion for reconsideration. OCC then filed the present appeal. It has now withdrawn the appeal in No. CV 89-700457 S.
The OCC's standing to appeal the DPUC's decision is established by C.G.S. 16-2a. That statute provides that the OCC "is authorized to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved" and that the OCC "may appeal from a decision, order or authorization in any such state regulatory proceeding. . . ." The court also finds that the DPUC's decisions of August 23, 1989; September 1, 1989; and the denial of the OCC's motion for reconsideration on October 5, CT Page 7743 1989, constitute "a final decision in a contested case" within the meaning of C.G.S. 4-183 (a) (rev'd to 1989); and that this appeal was properly and timely served and filed.
Plaintiff OCC raises eight issues in support of its appeal. They are as follows:
 1. The DPUC's failure to disallow the Company's F-4 Gas Supply Contract as excessive constitutes reversible error.
 2. The DPUC's adoption of CNG's depreciation expense calculation constitutes reversible error.
 3. The Company's adoption of a five-year average for determining "Unaccounted-For" gas expenses was erroneous.
 4. The DPUC's adoption of the Company's employment vacancy adjustment to payroll expenses constitutes reversible error.
 5. The DPUC's failure to disallow the full amount of the Company's lobbying expenses constitutes an abuse of discretion.
 6. The DPUC erred in its calculation of the size of the Company's customer pool.
 7. The DPUC erred in refusing to consider evidence proffered by the OCC at the August 9, 1989 hearing.
 8. The DPUC's allowed ROE is excessive given the evidence on the record in this appeal.
Pursuant to C.G.S. 16-35, appeals from decisions of the DPUC are subject to the provisions of C.G.S. 4-183. Subsection (g) of the latter statute provides as follows:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; CT Page 7744 or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
The relevant statutory guidelines imposed on the DPUC in its utility rate control function are set forth in C.G.S. 16-19e(a)(4) and (5), which read as follows:
 (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and forseeable; (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation. . . .
Our Supreme Court set forth the proper standard of review in appeals from rate orders of the DPUC in Connecticut Light Power Co. v. DPUC, 219 Conn. 51, 55-58 (1991). Relying on its previous decision in Connecticut Light Power Co. v. DPUC, 216 Conn. 627 (1990) [cited in the following excerpts as "CLP v. DPUC"], the court explained:
 In CLP v. DPUC, supra, we determined that the test set forth in 16-19e (a)(4) was embodied in 4-183 (g)(1). "Pursuant to General Statutes 16-35, the provisions of General Statutes 4-183 of the [UAPA] determine the scope of judicial review for administrative appeals from decisions of the DPUC." Id., 632-33. Additionally, 16-19e(a)(4) sets forth a test for establishing proper rates of public utilities. In CLP v. DPUC, supra, we recognized the confusion that existed in construing 4-183 (9), the UAPA standard of review of administrative decisions, and 16-19e(a)(4), the section embodying the United States Supreme Court test in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct., 281, 88 L.Ed. 333 (1944) (the Hope test), for review of public utility rate-making cases based on claims of unconstitutional confiscation.
 . . .(T)he incorporation of 16-19e(a)(4) into 4-183 (g) requires the trial court to conduct CT Page 7745 a statutorily circumscribed inquiry, based on the administrative record, into the merits of the administrative decision. "A court may not reverse or modify an agency decision unless it determines that an appellant's "substantial rights . . . have been prejudiced because the [agency's] findings, inferences, conclusions, or decisions' contravene any one of the section's six specific provisions. General Statutes 4-183(g)."
In reviewing the administrative rate decision, the court must, therefore, "ensure that the agency's decisionmaking process was conducted pursuant to the appropriate procedures and that the outcome of the process reflects reasoned decisionmaking — a reasonable application of relevant statutory provisions and standards to the substantial evidence on the administrative record. Section 4-183 (9) coupled with the presumption of validity that attends a DPUC rate order establishes a standard for judicial review that is appropriately deferential to agency decisionmaking, yet goes beyond a mere judicial `rubber stamping' of an agency's decisions." CLP v. DPUC, supra, 637.
"Substantial evidence" exists if the administrative record demonstrates "'a substantial basis of fact from which the fact in issue can be reasonably inferred. . . "With regard to questions of fact, it is neither the function of the trial court nor of this court `to retry the case or to substitute its judgment for that of the administrative agency.'. . . `Judicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion . . . .'" In the specialized context of a rate case, the court may not substitute its own balance of the regulatory considerations for that of the agency, and must assure itself that the DPUC has given reasoned consideration to the factors expressed in 16-19e(a)(4).
1. F-4 GAS SUPPLY CONTRACT CT Page 7746
The F-4 contract provides a firm or non-interruptible supply of gas from the Algonquin pipeline to CNG for resale to its customers. The price is $4.6 million and the gas supply is guaranteed. It amounts to 15% to 20% of the company's supply of gas, so that from the standpoint of service as well as expense, it is a major factor in CNG's rate structure. The OCC claims that the expense of the F-4 contract is unnecessary and excessive and that the DPUC's decision allowing that expense as a component in the rates charged to CNG's customers should be reversed.
The amount and price of non-interruptible or guaranteed gas supply is an appropriate subject of regulatory scrutiny. Most of the gas contracted for purchase by CNG for resale to customers is not guaranteed for ultimate delivery, meaning that the seller may divert that gas to other parts of the country if future demand and market conditions, prior to delivery to CNG, make it advantageous to do so. The gas which is not guaranteed is cheaper, therefore, than the gas which the seller guarantees to deliver regardless of future conditions. Obviously, however, the company cannot rely entirely on the cheaper nonguaranteed gas because it must always have a sufficient supply to meet its own customers' demands. Determining the amount of the more expensive guaranteed gas to purchase under contracts like the F-4, therefore, calls for considerable judgment and discretion on the part of the company. It must consider future customer demand, based on potential weather and market conditions; as well as the future availability of gas from all sources, based on nationwide demand and market conditions.
The OCC claims the DPUC utilized the wrong standard in denying OCC's request to exclude the cost of the F-4 contract from the proposed rate calculation. In support of this argument, the OCC cites the statement in the DPUC's decision that "an insufficient record exists in either this proceeding or Docket No. 88-05-15, DPUC Investigation into the Operating Procedures, Management and Efficiency and General Internal Workings of the Connecticut Natural Gas Corporation, to make a finding of imprudence." The OCC claims that this statement implies that the DPUC placed the burden on OCC to show that the contract was imprudent, whereas section 16-22 of the statutes provides that "[a]t any hearing involving a rate. . . of a public service company, the burden of proving that said rate under consideration is just and reasonable. . .shall be on the public service company." Second, the OCC claims that prior DPUC decisions indicate that the correct standard to determine the appropriateness of a gas supply contract is a "used and useful" standard. According to the OCC, this CT Page 7747 standard measures the amount of gas necessary to supply customer demand in a "design year" and requires that supplies purchased in excess of that amount not be charged to the customers — i.e. not be included in the rate calculation.
The court has examined the record and concludes that there was substantial evidence before the DPUC to enable it to determine that the inclusion of the F-4 contract expense in CNG's rate calculation was reasonable under either the "used and useful" standard or the "prudence" standard. Thus, there was evidence which had been presented in a prior, separate hearing that a guaranteed supply, such as afforded by the F-4 contract, was necessary to meet customer demand in 1987. Furthermore, CNG's manager in charge of energy services testified that the F-4 supply was needed and did not exceed design year requirements and presented charts and schedules to substantiate that position. The OCC argues that audits had revealed that the F-4 contract supply was excessive. However, that information was not available when CNG renewed the F-4 contract, and there was evidence which made the decision to renew at the time reasonable and prudent. In short, while there was conflicting evidence as to the necessity for the F-4 contract, there was nevertheless substantial evidence to support CNG's decision. It is not this court's role to retry the facts and substitute its judgment for that of the agency, nor may this court reverse the agency's decision simply because there was contrary evidence. Based on evidence in the record, the court holds that the DPUC's approval of the inclusion of the F-4 contract expense in CNG's rate structure was not clearly erroneous or an abuse of discretion.
2. Depreciation Expense
OCC's general position with respect to CNG's depreciation expense calculation is that the evidence presented by CNG's expert witness at the hearing was flawed and inconsistent. Nevertheless, the expert, whose credentials were unchallenged, did present substantial evidence to support the expense calculation, and there was no conflicting evidence. Again, the court will not second-guess the agency's evaluation of evidence unless the record demonstrates that the evidence is insubstantial or that the agency's conclusions were unreasonable. Such shortcomings are not present here. Based on the record, the court holds that the DPUC's decision approving the depreciation expense was not clearly erroneous or an abuse of discretion.
3. Unaccounted-For Gas Expense
"Unaccounted-for gas" is the difference between the CT Page 7748 amount of gas purchased by CNG for resale to ratepayers and the amount which is actually sold to the ratepayers. It includes gas that escapes during transmission through the pipelines and mains and gas which is not measured correctly because of discrepancies in meters. The OCC and CNG dispute whether it includes gas which is utilized by CNG itself, the company contending that it does not. The unaccounted-for gas is an expense charged to the ratepayers.
The OCC claims that the the factor requested by CNG and approved by the DPUC of 2.13% is too high. It was based on an historic five year average, and the OCC contends that the downward trend over that period indicates that a shorter period would more accurately reflect the actual figure for the future period when the new rates would be effective. The OCC recommended a three year period, which would produce a lower expense factor of 1.71%.
Evidence supporting CNG's position was supplied by its manager of energy planning, who testified as to the volatility of the figures from year to year. Furthermore, the five-year period has been used consistently in the past in Connecticut as well as in other states. Again, it is not this court's function to overrule the agency's evaluation of the evidence and the conclusions it draws therefrom so long as that evidence is substantial and the conclusion reasonable. This is so even if, as here, the opposing party produces conflicting evidence and a conflicting reasonable conclusion.
4. Employment Vacancy Adjustment
Another element of CNG's future operating expenses, and thus one element the DPUC uses to set future rates, is the amount of the Company's payroll expenses. While there are some 600 permanent employment positions within the Company, at any one time a certain number of these positions are vacant. For every vacancy on the payroll, the Company experiences a reduction in payroll expenses commensurate with the salary level of the vacant position. To determine the amount of savings which would be accrued by the Company in the future due to payroll vacancies, the DPUC averaged the actual salaries of vacant positions at the end of the test year. OCC claims that the DPUC erred in failing to accept OCC's proposed method for calculating payroll expenses, which was based on a company-wide salary average rather than an average of actual vacancy salaries.
The court has examined the record, including testimony of the CNG executive in charge of personnel, and concludes that there was substantial evidence to support the CT Page 7749 DPUC's adoption of the company's position. It was not, therefore, clearly erroneous or an abuse of discretion.
5. Lobbying Expenses
In its application, CNG requested an allowance of $40,000 for lobbying expenses. Of that $40,000, the DPUC disallowed the $15,000 paid to outside counsel and allowed the $25,000 of staff salaries. The DPUC reasoned that "Connecticut utilities often lobby successfully on behalf of their ratepayers" and cited as support "the most recent session of the Connecticut General Assembly when the imposition of a sales tax on utility services was scaled back dramatically, while a sales tax on the sale of heating oil in commercial markets was imposed, thereby preventing the potential erosion of gas sales in the competitive dual-fuel industrial market."
OCC claims that the DPUC's reasoning is arbitrary and capricious as there is no correlation between the amount of claimed benefit to ratepayers and the $25,000 figure and no other justification for burdening ratepayers with the larger portion of the expense. The OCC also asserts that it is "beyond dispute" that most of CNG's lobbying efforts are not aimed at benefiting ratepayers but rather are for the benefit of shareholders.
The issue of lobbying expense as a factor in utility rate construction is difficult and troubling. In this case, the economic effect is de minimis. The $25,000 allowed by the DPUC as an expense to be paid by the ratepayers has a negligible effect on the individual customer ($.19 per year). Indeed, if the court were to remand the case for a recalculation of the rates without allowance of the lobbying expense, the change would be nearly imperceptible. Nevertheless, the OCC argues that a remand is necessary because 1) the allowance of the expense is a clear departure from past DPUC practice and 2) the DPUC's decision does not adequately set forth the department's reasoning.
Testimony at the administrative level, cited by the DPUC in its decision, supported CNG's request on the basis that its lobbying efforts helped to defeat a proposal in the state legislature that a sales tax be imposed on gas sales. The lobbying, therefore, benefited the ratepayers by averting this additional expense to them. There was no conflicting evidence produced. With respect to the DPUC's past practice, the OCC cited several previous applications for rate approvals by other public service companies where the DPUC consistently disallowed lobbying expenses. A major difficulty, of course, in determining the reasonableness of charging the company's CT Page 7750 ratepayers with this expense is isolating the benefit to them as distinguished from the benefit to shareholders. In this case, in addition to testimony concerning the benefits to ratepayers, there was also evidence that the company's success in the legislature on the sales tax issue also helped its competitive position for its shareholders vis a vis the fuel oil industry.
The court concludes on the basis of the record, briefs, and arguments of counsel that OCC's appeal may not be sustained with respect to the lobbying expense allowance. There was substantial, uncontradicted evidence that the expense was for the benefit of the ratepayers, and the DPUC's decision so indicated. The DPUC was under no statutory or regulatory obligation to take the same position with respect to this expense as it had in previous cases. Moreover, it is not for this court to substitute its notions of public policy or regulatory considerations for those of the administrative agency. Conn. Light Power Co. v. DPUC, supra. Finally, the court cannot conclude that the ratepayers' "substantial rights" have been prejudiced, within the meaning of C.G.S. 4-183 (g), in view of the miniscule effect that the allowed expense has on the amount they must pay for their gas service.
6. Customer Pool
The court has examined the record, the DPUC's decision, briefs of the parties, and heard oral argument on this issue. The court finds no error in the DPUC's acceptance of CNG's calculation as to the number of its customers over the projected rate period.
7. August 9, 1989 Hearing
The DPUC continued the hearing on the rate case to hear evidence and allow cross-examination concerning CNG's property taxes and Late Filed Exhibit No. 65 to August 9, 1989. The OCC objected to the August 9, 1989 hearing and, in the alternative, requested the DPUC to expand the scope of that hearing to receive additional evidence of dropping bond yields and interest rates and increasing sales of gas by CNG to interruptible service customers. By way of oral motion at the commencement of the August 9, 1989 hearing, the OCC requested that the DPUC take administrative notice of this additional evidence. The DPUC denied the OCC's requests.
OCC claims that the DPUC's refusal to entertain the additional evidence is arbitrary and capricious in that it violated OCC's right to present evidence on all issues involved as required by C.G.S. 4-177 (c) (rev'd to 1989). That statute CT Page 7751 provides that "(o)pportunity shall be afforded to all parties to respond and present evidence and argument on all issues involved."
The court has carefully examined the record, including transcripts of relevant statements and testimony. Several factors undermine the OCC's contention that the procedure followed with respect to the August 9, 1989 proceeding was unlawful, unfair, or a denial of due process. First, the case was essentially closed, without objection, to all new evidence on June 19, 1989. On that date, the DPUC's presiding officer, Commissioner Neumann, declared that the case was closed, subject to the receipt of certain limited documents relating to evidence already on the record. At that time, there was no objection by any of the parties. The documents to be introduced were property tax bills not yet received by CNG, which would substantiate expenses already claimed, and Late Filed Exhibit 65, which provided details of certain adjustments to CNG's income statements. Although these documents related to evidence already before the DPUC, the additional hearing on August 9 allowed the DPUC and the OCC the opportunity to question them, if desired, prior to their admission as exhibits. The notice of the August 9 proceeding specifically stated the limited nature of the subject matter to be covered. By contrast, the evidence which the OCC wished to present on August 9 was entirely new. It consisted of sales and financial data relating to the period subsequent to June 1989; that is, after the date the case was closed. Moreover, such data is constantly changing, and it would be impossible ever to complete a rate case if a party were able without limitation to introduce new evidence of changing conditions. Presumably, as CNG claims, the company could have introduced new evidence after the June adjournment which would have supported its request for higher rates.
A second factor is the statutory requirement of finality. Section 16-19 (a) requires that the agency issue its decision no later than 180 days after the proposed effective date of the new rates. The final date for the decision in this case, therefore, was September 5, 1989, 180 days after the proposed March 14 effective date. The final decision on September 1, which did not consider the OCC's requested new evidence, barely made this deadline. Clearly, a thorough consideration of the new evidence, including an opportunity for CNG to cross examine and offer rebutting evidence, would have made a timely decision impossible.
The above factors persuade the court that the procedure followed in this case was not unlawful, unfair or a denial of due process. CT Page 7752
8. Return on Equity
The DPUC heard expert testimony, including the OCC's own witness, Mr. Eschbach, that an appropriate ROE for CNG was between 12.03% and 13.11%. The OCC later requested a rate of return factor of 12.25% and criticized the DPUC's assumptions of growth rate in applying the discounted cash flow method to estimate the cost of equity. The court concludes, after examining the record, that there was substantial evidence to support the DPUC's decision to permit an ROE of 12.90% and that it was not, therefore, clearly erroneous or an abuse of discretion.
Underlying much of the OCC's arguments on the various bases of its appeal in this case is the contention that the DPUC's decision is defective because it does not specifically address the position of the OCC and state why such position is rejected. The court agrees with the DPUC that in this case it was sufficient for the DPUC to state the basis of its decision without responding point by point to the OCC's arguments.
For all of the reasons set forth above, the court finds the issues for the defendants. Accordingly, the appeal is dismissed.
MALONEY, J.